IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 04-cv-02092-MSK-PAC

TIMOTHY HOLLINGSHEAD,

    Plaintiff,

v.

PROVINCE HEALTHCARE COMPANY d/b/a Colorado Plains Medical Center,

    Defendant.

_____

**OPINION AND ORDER GRANTING, IN PART,
MOTION FOR SUMMARY JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to the Defendant's Motion for Summary Judgment **(# 41)**, the Plaintiff's response[1] **(# 50)**, and the Defendant's reply **(# 54)**.

## FACTS

Taken in the light most favorably to the non-movant Plaintiff, the facts are as follows.[2] The Plaintiff formerly operated a podiatry practice in Fort Morgan, Colorado, and enjoyed surgical privileges at Defendant Province Healthcare Company's Colorado Plains Medical Center ("the Hospital").

---

[1] The Plaintiff's response fails to comply with the format for summary judgment motions and responses in this Court's Practice Standards.

[2] The bulk of the factual recitation contained in the Plaintiff's response is not supported by citation to evidence in the record, and thus, the Court does not consider the unsupported factual assertions in determining whether to grant summary judgment. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). However, the Court may refer to some of these unsupported facts in its factual recitation, for purposes of setting forth a coherent factual background.

1

In 2002, the Plaintiff experienced medical problems that prompted him to attempt to sell his practice. On April 12, 2002, the Plaintiff met with Tim Parker, CEO of the Hospital. At that meeting, the Plaintiff presented a handwritten document, entitled "Confidentiality Agreement," for Parker to sign. The Agreement reads as follows:

> I agree not to disclose any of the information discussed at the 4/21/02 (sic) meeting with Dr. Timothy S. Hollingshead. I understand this information is highly sensitive. I understand and agree that I will not act on this information until permitted by Dr. Hollingshead in writing. This would include, but not be limited to the hiring/recruiting of additional surgical podiatrists or encouraging [any?] podiatrist to join the staff of CPMC. Private or public communication of (sic) any forum to anyone regarding the content or information obtained through this meeting.

*Docket #* 50, Ex. 1.

After Parker signed the agreement, the Plaintiff disclosed that his medical condition prevented him from continuing his practice, and asked if the Hospital would be willing to guarantee the income of a potential purchaser of the Plaintiff's practice. Parker responded that the Hospital would issue such a guarantee. At the end of the hearing the Plaintiff and Parker verbally agreed that the Hospital would not enter into the income guarantee until the buyer had signed an agreement to purchase the Plaintiff's practice.

The Plaintiff then recruited and began working with Dr. Eric Oudekirk, who had expressed interest in buying the practice. However, in July 2002, Oudekirk entered into an employment agreement with the Hospital, and advised the Plaintiff that he was no longer interested in purchasing the practice. The Plaintiff contends that, by entering into an agreement with Oudekirk, the Hospital breached both its agreements with the Plaintiff. Thereafter, the

Plaintiff met with an official of Defendant Providence, and persuaded them to rescind the contract with Oudekirk.

In August 2002, the Plaintiff recruited and entered into an employment contract with a second potential replacement, Dr. Lorin Brandon, with both parties anticipating that the situation might result in Brandon buying the Plaintiff's practice. However, on October 14, 2002, Brandon's attorney wrote to the Plaintiff, rescinding his employment agreement. Brandon accused the Plaintiff of abandoning Brandon and the practice, and of misrepresenting to Brandon the possibility of Brandon obtaining staff privileges at the Hospital. (The letter alleged that the Hospital had advised Brandon that it would not extend privileges to him so long as he was associated with the Plaintiff.) The Plaintiff disputes Brandon's allegations that he abandoned the practice or otherwise breached or invalidated the employment agreement. On October 20, 2002, Brandon signed an contract with the Hospital, and began seeing patients of his own.

The Plaintiff contends that the competitive presence of Brandon in the Fort Morgan community diminished the value of the Plaintiff's practice, making it impossible to sell. In April 2003, apparently without having found a buyer, the Plaintiff closed the practice.

The Plaintiff currently asserts four claims against the Hospital: (i) breach of the Confidentiality Agreement and oral contract with Parker; (ii) tortious interference with contract, by inducing Brandon to terminate his employment contract with the Plaintiff; (iii) tortious interference with prospective relationship, by interfering with Plaintiff's efforts to sell his practice to Brandon; (vi) civil conspiracy, in that the Hospital (through Parker) conspired with Brandon to breach their contracts with the Plaintiff and drive the Plaintiff's practice out of business.

The Hospital moves for summary judgment on all four claims, arguing: (i) that on the breach of contract claim, the Plaintiff cannot show that the Hospital failed to perform under the written Confidentiality Agreement, and cannot show that the verbal agreement is an enforceable contract; (ii) that on the tortious interference with business relations claim, the Plaintiff cannot show that the Hospital interfered with the Plaintiff's contract with Brandon, did so intentionally, or by wrongful means; (iii) that on the tortious interference with business relations claim, the Plaintiff cannot show that the Hospital interfered with any prospective relationship; and (iv) that on the civil conspiracy claim, the Plaintiff cannot show any unlawful overt act.

## ANALYSIS

### A. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law determines what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party,

thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the non-movant comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the non-movant fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B. Breach of Contract

To establish a claim for breach of contract, the Plaintiff must prove: (i) a contract existed; (ii) the Plaintiff performed his obligations under the contract or was excused from such performance; (iii) the Hospital failed to perform its obligations under the contract; and (iv) the Plaintiff sustained damages as a result. The Hospital challenges the Plaintiff's ability to prove the third element – breach – with regard to the Confidentiality Agreement, and the first element – the existence of a contract – with regard to the alleged verbal agreement by the Hospital not to enter into an income guarantee with any podiatrist until the podiatrist had agreed to buy the Plaintiff's practice was a contract. In his response, the Plaintiff disclaims any intent to allege a claim with regard to the alleged verbal agreement, *Docket* # 50 at 16, and thus, the Court focuses only on the claim that the Hospital breached the Confidentiality Agreement.

The Plaintiff characterizes that agreement as having two components: "prohibitions of disclosure of confidential information as well as an agreement that Province would not hire or recruit additional surgical podiatrists, whether or not confidential information was disclosed."

*Docket* # 50 at 15.  The Plaintiff's brief does not point to any facts alleging the disclosure of confidential information, and thus, the Court confines its inquiry to whether there is evidence that the Hospital breached the agreement not to recruit or hire podiatrists.

To discern the intent of the parties to a contract, the Court starts by examining the plain language of the agreement. *Bedard v. Martin*, 100 P.3d 584, 588 (Colo. App. 2004).  If unambiguous, the Court will apply the agreement as written. *Id.*  If the language is ambiguous, the Court may turn to parol or extrinsic evidence to determine the parties' intent. *Moland v. Industrial Claim Appeals Office*, 111 P.3d 507, 511 (Colo. App. 2004).  Whenever possible, the contract should be read to give effect to and harmonize its provisions. *Bedard*, 100 P.3d at 588.

The Plaintiff highlights that portion of the Confidentiality Agreement that reads "This would include but not be limited to the hiring/recruiting of additional surgical podiatrists or encouraging any podiatrist to join the staff of CPMC," arguing that that language represents an agreement by the Hospital "to not hire or recruit additional surgical podiatrists." *Docket* # 50 at 15.  This is an overly broad reading of the quoted language.  The quoted passage begins with the phrase "This would include," clearly linking the provisions of the quoted sentence to some other provision earlier in the contract.  Read in conjunction with the prior sentence of the Confidentiality Agreement, it is clear that the word "This" modifies the word "act" in the prior sentence.  In other words, the parties agreed that the Hospital would "not act on [the confidential] information" and the parties further agreed that "act[ing] on the information" would include actions such as hiring additional surgical podiatrists or encouraging podiatrists to join the staff. Of critical importance, however, is that the Hospital's agreement was not to refrain from

"act[ing]" in all general respects, but to refrain from acting "on the [confidential] information" the Plaintiff gave.

Thus, the plain language of the contract prohibited the Hospital[3] from using its knowledge of the Plaintiff's confidential information – namely, his medical condition and intention to retire – to recruit a new podiatrist. It does not, as the Plaintiff argues, categorically prevent the Hospital from hiring a podiatrist until the Plaintiff consented to such a hire. Under the terms of the agreement, so long as the Hospital's hiring was not an action taken as a consequence of the Hospital learning of the confidential information disclosed by the Plaintiff, the hiring was not a violation of the agreement.

The question then becomes whether the Plaintiff can prove that the Hospital's recruiting of Oudekirk and Brandon was done as a consequence of the Hospital learning of the Plaintiff's confidential information. There is at least temporal evidence to suggest that this is the case, as the Hospital extended an offer to Oudekirk only a few months after the Plaintiff disclosed his intention to retire to the Hospital. Taking the evidence in the light most favorably to the Plaintiff, the closeness temporal proximity between the Plaintiff's disclosure of his intention to retire and the Hospital's extension of an employment offer to Oudekirk could permit a jury to conclude that the latter occurred as a direct consequence of the former. Once the Hospital rescinded Oudekirk's offer and the Plaintiff recruited Brandon, the Hospital again extended an employment

---

[3]The Hospital argues in its reply brief that Parker signed the Confidentiality Agreement with a reservation that the agreement would not become effective until reviewed and approved by the Defendant's attorneys, and that no such approval ever occurred. Because this argument – which challenges the formation of the contract in the first instance – was not raised in the initial briefing, the Court will not consider it in reply.

7

offer to Brandon within a short period of time. Again, a reasonable jury could conclude that the Hospital did so as a consequence of knowing the Plaintiff's intention to retire from practice.

The Hospital argues that the Plaintiff's "confidential information" – namely, that he was retiring from medical practice and seeking to sell his business – stopped being "confidential" by May 13, 2002, the date that the Plaintiff stopped seeing patients. As a result, it argues, its hiring of Oudekirk and Brandon – both of which occurred after May 13, 2002, were not made based on the Plaintiff's "confidential" disclosure of his retirement, but rather, based on his now-publicly-known retirement. What significance should attach to the fact that the Plaintiff was no longer seeing patients is an issue for the factfinder. The record does not unambiguously indicate that the confidential nature of the information covered by the contract had been extinguished by the time the Hospital recruited Oudekirk and Brandon. This factual issue is appropriately determined through trial. Thus summary judgment on this claim is denied.

### C. Tortious Interference with Contract

The Plaintiff contends that the Hospital interfered with his employment contract with Brandon. To prove this claim, the Plaintiff must show that the Hospital: (i) intentionally and (ii) improperly (iii) interfered with the performance of a (iv) contract between the Plaintiff and a third party, (v) causing damages as a result. *Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.,* 311 F.Supp.2d 1048, 1115 (D. Colo. 2004), *citing Memorial Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207, 210 (Colo.1984). The Hospital contends that the Plaintiff cannot show that it interfered with the Plaintiff's contract with Brandon, nor that any such interference was improper or intentional.

8

The Hospital argues that no interference occurred because it entered into an income guarantee with Brandon on October 20, 2002, six days after Brandon had already rescinded his employment agreement with the Plaintiff. However, the Hospital ignores evidence in the record that it had been in discussions with Brandon about entering into a contract weeks earlier. Exhibit 8 to the Plaintiff's brief is an e-mail between officials of the Hospital, dated October 7, 2002, a week before the Plaintiff rescinded his agreement with the Plaintiff. The e-mail states that "Dr. Brandon's contract will get to him tomorrow," and acknowledged that Brandon "had recently started working" with the Plaintiff and had "entered into a contract." Thus, the e-mail indicates that the Hospital was aware that Brandon currently had a contract in effect with the Plaintiff, and that the Hospital nevertheless had negotiated its own contract with Brandon, including a guarantee of Brandon's income. The jury could reasonably conclude from this evidence that the Hospital intentionally induced Brandon to rescind his contract with the Plaintiff in favor of the offer made by the Hospital. Taken in the light most favorably to the Plaintiff, this evidence is sufficient to establish the element of interference.

The Hospital argues any such interference was not achieved through improper means, as the Hospital is a competitor with the Plaintiff for Brandon's services, and thus, a heightened standard of impropriety applies.[4] This argument is based on a finding by the Colorado Supreme Court that "one who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at

---

[4] The Court has some question as to whether invocation of the "competitor's privilege" is actually an affirmative defense for which the Hospital would bear the burden of proof. Because the Court finds that, as a matter of law, the privilege does not apply to tortious interference with contract claims, it need not address the issue.

9

will does not interfere improperly with the other's relation" is not liable if: (i) it concerns a matter of competition between the defendant and plaintiff; (ii) the defendant does not employ wrongful means; (iii) the action does not amount to an unlawful restraint of trade; and (iv) the defendant's purpose is, at least in part, to advance its own interest. *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 502 (Colo.1996), *citing Restatement* (Second), Torts § 768, comment e. In such circumstances, the competitor is liable only for interference that results through "wrongful means," namely, "predatory means [such as] physical violence, fraud, civil suits and criminal prosecutions." *Id.*

However, the competitor's privilege is not applicable to claims that a defendant has caused a third party to breach an existing contract with a plaintiff. Both *Ervin* and the Restatement refer to the competitor's privilege in the scope of inducing a third party to "[not] enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will." 908 P.2d 501. As the court in *Ervin* notes, this section of the Restatement "differentiates between interference with an existing contract ... and interference with a prospective contractual relation." *Id.*, *citing Restatement*, § 768. The Restatement provides that "competition is not an improper basis for interference in the latter situation," that is, interference with a prospective relation, and that "an existing contract, if not terminable at will, involves established interests that are not subject to interference on the basis of competition alone." *Restatement*, § 768, comment a. Thus, because Brandon had an existing contractual obligation to the Plaintiff, the Hospital, as an alleged "competitor" for Brandon's services, was

not privileged to interfere with that contract. The Hospital's argument that a heightened standard of impropriety should apply is without merit.[5]

Finally, the Hospital argues in reply that "Plaintiff does not explain how the income guarantee agreement could have possibly induced Dr. Brandon to terminate his employment agreement with the Plaintiff." The Court interprets this as a contention that the Plaintiff cannot show that the Hospital's interference with Brandon's contract was intentional. The Court confesses that it, too, has some uncertainty as to how the income guarantee offered by the Hospital would necessarily induce Brandon to cease performing his contractual obligations to the Plaintiff. The contract between Brandon and the Hospital states that the Plaintiff will undertake certain "duties and responsibilities"[6] to the Hospital, and in exchange, the Hospital guarantees that Brandon's "Cash Collections for professional services" will not be less than a certain amount for a certain time. By all appearances, the "professional services" that Brandon would provide would not be as an employee of the Hospital itself, as the income guarantee disclaims any employer-

---

[5]The Hospital does not clearly argue that the Plaintiff cannot establish the element of improper means under the more general conception of the tort. Whether an actor's conduct is improper is determined by weighing a number of factors, including the nature of the conduct; the actor's motive; the varying interests of the actor, the person whose rights were interfered with, and society; and the nature of the relations between the parties. *Trimble v. City and County of Denver,* 697 P.2d 716, 726 (Colo. 1985), *citing Restatement* (Second), Torts § 767. Such a fact-intensive inquiry is not suited for resolution by summary judgment. In any event, there is evidence in the record that the Hospital applied some economic pressure to Brandon to dissolve his agreement with the Plaintiff, as the Hospital allegedly advised Brandon that it would not grant him surgical privileges so long as he was associated with the Plaintiff. This alone might be sufficient to demonstrate that the Hospital used improper means.

[6]The copy of the income guarantee contract submitted by the Plaintiff as an exhibit, *Docket* # 50, Ex. 9, is incomplete, omitting attachments A-D that are referenced in the agreement itself and which apparently set forth most of its operative details. For example, according to the contract, attachment A sets forth "the duties and responsibilities to be performed by you pursuant to this Agreement."

11

employee relationship.  Rather, it would appear that the Hospital is guaranteeing that Brandon would receive a certain level of income from engaging in his own practice, whether that practice be as a successor to the Plaintiff or not..  Thus, there does not appear to be anything inherently inconsistent between the Hospital guaranteeing Brandon's income and Brandon performing his contract with the Plaintiff.  Nevertheless, because the record is ambiguous as to how the various parties and their agreements interrelate, the Court will favor the Plaintiff's right to a trial, and allow the tortious interference with contract claim to proceed.  However, the Plaintiff is advised that if, at the close of his evidence at trial, he is unable to demonstrate that the Hospital knew that guaranteeing Brandon's income would induce him to rescind his contract with the Plaintiff, the Court will grant judgment to the Hospital under Fed. R. Civ. P. 50(a).

### D.  Tortious Interference with Business Relations

The Plaintiff also asserts that the Hospital interfered with the Plaintiff's prospective business relationships by inducing Brandon to not buy the Plaintiff's practice.

To establish a claim of tortious interference with prospective relations, a plaintiff must show (i) intentional, and (ii) improper (iii) interference by a defendant that (iv) prevents the formation of a contract between the plaintiff and a third party.  *Ervin*, 908 P.2d at 500.  To determine whether the interference was improper, the Court weighs multiple factors, examining issues such as the nature of the actor's conduct, his motive and the interests he seeks to advance, the interests of the party whose rights are interfered with, social interests in the two outcomes, and so on.  *Ervin*, 908 P.2d at 500-51, *citing Restatement* (Second), Torts, § 767.

The Hospital alleges that the Plaintiff cannot show that it interfered with the Plaintiff's prospective sale of his practice to Brandon, nor that, if such interference existed, it was anything

but permissible competition. There is evidence in the record to indicate that, with knowledge of the negotiations between Brandon and the Plaintiff to sell the practice, the Hospital offered to guarantee Brandon's income. *Docket* # 50, Ex. 8. The Plaintiff argues that, by guaranteeing Brandon's income, the Hospital reduced Brandon's willingness to pay full value for the Plaintiff's practice. Although, once again, the Court has some question as to how issuing such a guarantee induced Brandon to abandon plans to purchase the Plaintiff's practice, the Court will infer that such a causal relationship could exist[7] and find that the Plaintiff has demonstrated a genuine issue of fact as to whether the Hospital intentionally interfered with the Plaintiff's prospective business relations.

The Hospital also argues that any such interference was legitimate competition, and thus, not improper. As discussed above, the competitor's privilege permits parties in competition to engage in a certain amount of interference with one another's prospective business relationships. The Plaintiff's response attempts to dispel the competition argument with a perfunctory conclusion. "This is not simply a matter of competition," the Plaintiff argues, "Tim Parker, on behalf of Province, agreed that the hospital would not recruit or hire another podiatrist. That provision of the agreement supercedes Province's 'competitive economic pressure' argument." *Docket* # 50 at 23. No legal support is cited by the Plaintiff for the proposition that parties can, by agreement, disclaim their competitive position. In any event, it is clear from this argument that the Plaintiff concedes that the Hospital was in competition with him over the recruiting of

---

[7]For example, it is conceivable that, out of an abundance of financial caution, Brandon sought to buy the Plaintiff's practice as a going concern rather than risking the financial hazards of starting a new practice of his own. The Hospital's guarantee that Brandon would receive a certain level of income might have affected this calculus, encouraging Brandon to strike out on his own rather than buying the Plaintiff's practice.

13

podiatrists, and it is only by means of the agreement between the Plaintiff and the Hospital that the Hospital surrendered its right to compete. Thus, it is clear that the Plaintiff's remedy for the Hospital's interference with his prospective business relations, if any, lies in contract, not in tort.

Accordingly, the Hospital is entitled to summary judgment on this claim.

### E. Civil Conspiracy

The Plaintiff's response brief regarding this claim is premised on a contention that Parker, on behalf of the Hospital, and Brandon conspired together to each breach their contracts with the Plaintiff for the purpose of causing "the demise of the Hollingshead practice." *Docket # 50 at 26*. The Hospital contends that the Plaintiff cannot prove that it engaged in any unlawful overt act.

To establish a claim for civil conspiracy, a plaintiff must prove: (i) an object to be accomplished; (ii) an agreement by two or more persons on a course of action to accomplish that object; (iii) in furtherance of that course of action, one or more unlawful acts which were performed to accomplish a lawful or unlawful goal, or one or more lawful acts which were performed to accomplish an unlawful goal; and (iv) damages to the plaintiff as a proximate result. *Double Oak Const. LLC v. Cornerstone Development Intl.*, 97 P.3d 140, 146 (Colo. App. 2003); *Jet Courier Serv. v. Mulei*, 771 P.2d 486, 502 (Colo. 1989). A claim for civil conspiracy is not self-supporting; rather, the underlying acts must be legal wrongs in themselves and support an independent cause of action. *Id.* If the acts underlying the conspiracy do not independently support a cause of action, there is no cause of action for the conspiracy itself. *Id.*

Here, the Plaintiff's summary judgment response identifies an actionable legal wrong that the parties purportedly agreed to commit. Specifically, the Plaintiff alleges that the Hospital and Brandon met prior to October 20, 2002 and agreed that Brandon would breach his employment

agreement with the Plaintiff. The breach of a contract is an unlawful act that could support a breach of contract claim. *See e.g. Jet Courier*, 771 P.2d at 502. Thus, the Hospital is not entitled to summary judgment on this claim.[8]

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment **(# 41)** is **GRANTED IN PART**, insofar as the Defendant is entitled to judgment on the Plaintiff's claim for tortious interference with prospective business relations, and **DENIED IN PART**, insofar as the Plaintiff's breach of contract, tortious interference with contract, and civil conspiracy claims require trial.

Dated this 20th day of July, 2006

**BY THE COURT:**

_Marcia S. Krieger_

Marcia S. Krieger
United States District Judge

---

[8] It would appear that the civil conspiracy claim precisely duplicates the Plaintiff's tortious interference with contract claim, in that both seek to hold the Hospital liable for participating in Brandon's decision to rescind his contract with the Plaintiff. The Court strongly encourages the Plaintiff's counsel to consider whether, in light of his success in preserving the tortious interference with contract claim against the Hospital for trial, withdrawal of the civil conspiracy claim is appropriate.